The next matter, number 191746, David Carson et al. v. A. Pender Makin Good afternoon, your honors. Tim Keller on behalf of the appellant parents meets me at council table. Zarif Pandju and Leah Patterson also on behalf of the appellant parents. I would like to reserve three minutes for rebuttal. You may. The parents here, like the parents in Hewlett, in light of significant and recent U.S. Supreme Court precedent, are asking this court to reconsider its prior precedent. Specifically, under Trinity Lutheran, we believe that it is now clear that the government may not exclude religion wholesale from a generally available benefit program. You say, and you say frequently in your brief, that the religion that is excluded is wholesale. What do you make of the answer that I gather it was the prior commissioner, Hassan, made to the effect that the practice of the department itself is to require not merely that an ineligible grantee be a religious organization, but in addition to that, be a religious organization that engages in some kind of religious advocacy or teaching function for the purpose of, in effect, inculcating religion. And that is not wholesale. That is religion plus. And your whole argument seems to be premised on treating the main rule as a religious wholesale rule, which in its administration, apparently it is not. I believe it is, in the sense that, under the way you phrased your question, I believe you suggested that a quote-unquote religious school that did not inculcate religious beliefs could participate in the program. And I don't believe that's true. But here's the testimony from the main superintendent that indicates that would be true. Please describe how you interpret the language non-sectarian school. He says, in making its determination whether a particular school is in compliance with section 2951, the department considers a sectarian school to be one that is associated with a particular faith or belief system in which, in addition to teaching academic subjects, promotes the faith, while affiliation or association with a church or religious institution is one potential indicator of a sectarian school. It is not dispositive. The department's focus is on what the school teaches through its curriculum and related activity and how the material is presented. Well, Your Honor, it sounds to me that if that is indeed the position of the current commissioner, that that position itself would violate the establishment clause, because it is preferring one type of religion over another. And that's explicitly excluded. Which religion is it preferring? The benefit that Maine is offering is a publicly funded secular education. The commissioner is just saying, we're going to look at your curriculum, even if you, the institution, have a religious identity, we're going to look at your curriculum to see if the education that you offer meets our secular requirements or whether it inculcates your religious beliefs. Well, Your Honor, there's no dispute here that the schools that my clients wish to attend, using the tuition benefit, satisfies the state's curricular requirements, the basic educational requirements. There's nothing in the record that indicates that their curriculum, leave aside the fact that they are religiously sponsored, there's nothing that indicates that their curriculum as currently constituted would qualify under that description that the superintendent has given, which is the description of record in this case. Well, Your Honor, there was no deposition. They've never applied, and therefore we don't know. There was no deposition of the superintendent in this case. That is not part of this record, and what the statute requires in order for a school to apply to receive the tuition benefit. Imagine, I take it you might say there's a record dispute. If the record were that non-sectarian accordance with the First Amendment were construed as I just read you, I guess it's the former commissioner, stated it is understood, what would be left of your position? The entire position, Your Honor, because we've also brought an Establishment Clause claim, and I believe that under the Establishment Clause, the government cannot favor one religion over another. They can't say that because this particular school takes its religion seriously and actually tries to inculcate the values of our religious faith into the students at our school, they're precluded, but another school that is religiously affiliated What precedent do you have for that? I think the Tenth Circuit's decision is the most persuasive on this point. Judge Michael McConnell in that issue said that in the case of Colorado Christian University, the state could not exclude what they called pervasively sectarian schools in favor of sectarian schools because that is a form of religious discrimination that would violate the Establishment Clause. The precedent in this circuit, of course, is Hewlett does contain an Establishment Clause holding, and the very last sentence of that holding is something like, in all events, we are aware of no precedent holding that a scheme which does not prefer any religion at all can violate the Establishment Clause. But, Your Honor, I think that precedent is now on the books in the form of Trinity Lutheran. Well, I don't think it is. I think that's maybe a block, and I don't think Trinity Lutheran, the Trinity Lutheran court, as I read it, went to great pains as a court to disassociate itself from that position and to hold that religious identity or status as a criterion can work a violation of the Free Exercise Clause, but the situation that's posed to you by Judge Barron is one in which it's not religious identity or status which is posed as the determining criterion, but the content of the benefit. Your Honor, what the Supreme Court said in Trinity Lutheran was that laws that target the religious for special disabilities based on not only religious status, which is what you focused on in your question, but also religious conduct or religious beliefs trigger strict scrutiny, particularly in the context of the sort of generally available benefit program that exists here in Maine. But you have to first define the benefit. Right, and I don't believe Trinity Lutheran allows the ULIT definition of a secular education to stand. Well, what if it says it doesn't? Because if you can simply redefine the benefit as, this is only for secular. I understand the idea of Trinity Lutheran potentially calling into question ULIT insofar as it's a status-based restriction, because the benefit would be arguably any qualifying educational curriculum. And then the only people ousted are because of their religious status. So then we'd have to deal with, well, what's the significance of the footnote in Trinity Lutheran? But we don't get to that question if the restriction's not status-based and is instead based on the content of the instruction. You might have an argument of the kind you're making as to why you should nonetheless win, but ULIT resolves that question. And nothing in Trinity Lutheran, as I read it, suggests in that circumstance that there's a constitutional problem. Well, Your Honor, I disagree that there's a binary choice between status and use. It's not just whether this is status-based discrimination. Trinity Lutheran is clear that through exercise of cause also triggers scrutiny when laws burden religious conduct and religious beliefs. Here, there's no doubt that the conduct that my clients are engaging in is religious conduct. And I believe Trinity Lutheran does limit the broad reading that this Court and ULIT gave to Locke. Because if it didn't limit that decision, clearly Locke or Trinity Lutheran itself would have come out differently because it would have sanctioned the wholesale exclusion of religion from the program at issue there. Counsel, before your time runs out, I simply want to call to your attention that you may have a threshold problem here. I'm seriously concerned about whether we have Article III standing to hear this appeal in the first place. Your Honor, I expect to address a lot of that in my rebuttal, but I think ULIT is unquestionably the best case we have when it comes to standing. The Article III standing question that's raised here was not raised in ULIT. It was addressed explicitly in ULIT. No, a standing question was raised. But in ULIT, the question that was raised is whether the plaintiffs on a use tertiary theory could assert the right of the school. Here, we've got a record not suggested in ULIT where the record suggests that there is no school which will currently apply for this benefit no matter how Maine construes the statute. So long as Maine sticks to its criterion that fair employment practices must govern all recipients. Would you like me to respond now or wait until my time? I'd like you to respond now. All right, thank you. Your Honor, in ULIT, the Court specifically noted that parents in and of themselves had standing and noted two relevant facts with regard to redressability. Number one, that the schools may not want to participate in the program at all because of concomitant state regulations that may apply to them. And number two, in that case, the citizens were from the town of Minot, which only permitted up to 10% of the students to apply for the tuition benefit, and only if the district itself permitted them to receive it if they could demonstrate that the public school they contracted with did not meet their educational needs. Those two things go directly to the same issues of redressability that are brought up here by my friends at the State. Thank you. Peter Police, the Court. A vague story for the United States. I'd like to begin by explaining why the State of Maine's interpretation of its policy that's been advanced so far in this case is actually distinct from the way they've applied it in the past as borne out by the record in this case. And then after I do that, explain why that's clearly unconstitutional under Trinity Lutheran, I'd like to turn to why even the version of the policy they have defended in this case is also a violation of Trinity Lutheran. I would draw the Court's attention to Exhibit 2 of the stipulated record, which is at pages 12 to 14, which is a discussion of an application by what is described as a school with an Episcopalian tradition, but that does not have a curriculum that is influenced by the Episcopalian church. The State of Maine declined to provide funding for that school, and here's the explanation that was provided. Quote, nonsectarian is defined as, internal quotes, not affiliated with or restricted to a particular religious group, close internal quotes. The Kent school mission statement clearly indicates an affiliation with the Episcopal church. Therefore, we are unable to approve the school for receipt of public funds. So what they're looking at is just, do you say in your mission statement you are associated Well, what do we do with the fact that the records mix them up? They also, in the Codman, I think this was a Codman Mountain School application, they inquired into what's the nature of the chapel requirement, which is inconsistent with your position. It's clear that the State of Maine has applied its own requirement inconsistently, and so if you want to look at what the Maine Supreme Judicial Court has said rather than at what the Commissioner has done in different cases, we could look at that instead. I draw the Court's attention to Bagley against Raven School Department. This is in 1999. Here's what the Maine Supreme Judicial Court said. The tuition statute explicitly excludes only those private schools with religious affiliations. And later, in the same opinion, it does not place any restrictions or limitations on the use of the funds or the content of the course offerings. So I think it's quite clear, if you look at what the Maine officials have done in at least some past instances, and at what the Maine Supreme Judicial Court has said, that this is a restriction on what the nature of the institution might be. But in the case of that kind of inconsistency, in which there certainly are examples in which they have taken what I call a religion-plus position, aren't we entitled to decide the case on the basis of the Hassen Statement, which is uncontradicted, not qualified in the record by the Maine Department, and go on that basis? First, I think it is contradicted by the other evidence from the record that I've just recited. But second, let's put all that evidence aside and concentrate solely on that statement. I'm happy to explain why we think that, too, would violate Trinity Lutheran, although we acknowledge that that's a harder case, and especially given Hewlett on the books. We might be pushing at the edges of what we can extract out of Trinity Lutheran in that circumstance. But I'd say even with the policy as now described by the state, there are at least two problems. The first is that they're still saying that religious affiliation is taken into account as a negative factor against the institution. This is a potential indicator. It's a potential indicator that can lead to the disqualification of that institution from receiving benefits. So at least to that extent, we think it is unconstitutional. But in addition, when they say the department considers a sectarian school to be one that is associated with a particular faith or belief system, and which, in addition to teaching students academic subjects, promotes the faith or belief system, I think that would sweep in a school that, for instance, taught math, science, social studies, and English throughout the day, and that at the beginning of the day had school prayer, and at the end of the day had some kind of religious activity, but through most of the time was engaging in secular instruction. Well, why isn't that just not within the scope of the benefit? I agree that that kind of circumstance where the institution is providing a secular education with some religious elements is going to get us to the edge of that status use line that the Supreme Court has drawn. But I think the best place to look for why the antiestablishment interests can't outweigh the interest in avoiding that religious element, it doesn't have to be an antiestablishment. It's just a different benefit. We just don't want to fund that. I don't think that the court's cases have gone quite that far. If you look, for example, at the speech cases where the state says, we won't fund religious speech or speech from a religious viewpoint because we don't like the religion. This isn't deformed. I agree. I'm merely drawing an analogy to those cases to explain why the burden on the individuals cannot be justified by the antiestablishment interests that the state has asserted. I think even when there are some religious elements and some secular elements mixed in, to the extent the state is denying the benefit for the secular elements, there is a burden because what the state is saying is, as long as you are teaching math, science, and English, you still don't get the tuition for that if, in addition to those, you also do some religious things at the school. That's where the burden comes in. That's where we have to weigh the state's antiestablishment interests under the current precedents, and that's something that the state can't do. Before you sit down, in your brief, if I read it right, you don't seem to mention the footnote in Trinity Lutheran that limits it. Am I right about that, that you just didn't mention that footnote? I don't recall our having mentioned that footnote. That's right. So the footnote's pretty significant. I at least want some analysis by the Solicitor General of the United States as to the significance of that limitation. So could you offer us the view of the government as to what we are to make of that footnote and what the actual holding of Trinity Lutheran is, particularly because you're aware of the law of the circuit doctrine, and we can't deviate from it unless there is a court case that actually decides something that requires us to. So the issue of what Trinity Lutheran actually held is obviously directly relevant to this case, but you don't seem to address it. The footnote states that the court did not address religious uses, and we're not contending that the court needs to address religious uses in this case. We've rested our argument on religious status. So to that extent, the footnote isn't even pertinent to our argument. There is the other part of the footnote that talks about playground resurfacing. Now, that part of the footnote should be read in the context of the rest of the opinion. The rest of the opinion states that discrimination on the basis of religious status is odious to our Constitution. I don't think the footnote can plausibly be read to suggest that the court was saying that that discrimination is odious to our Constitution on the playground and not odious off the playground. Rather, the footnote is describing what the circumstances before the court in that case were. But does the footnote do anything other than place playground resurfacing in the same category as police protection and fire protection and so on? No, I don't think that would be the right way of reading the footnote. Rather, the court announces its principles in the opinion. Those principles are applicable in other cases, and the footnote explains that the result that the court has calculated under those principles is what they've calculated in the context of playgrounds. The courts still have to apply those same principles in other contexts, and maybe that leads to different results, maybe not. But the relevant principles still control in those other settings. Good morning, or maybe it's afternoon by now, Your Honors. May it please the Court, my name is Sarah Forster. I'm an Assistant Attorney General from the State of Maine, and I'm here representing Maine's Commissioner of Education, Pender Makin. Before we can even start talking about Trinity Lutheran, its footnote, and what, if anything, it does to the ULIT decision, as Judge Selya mentioned, there is a very significant standing issue here. And, as we must acknowledge, it was not briefed, it was not argued, it was not a part of ULIT. We spent a lot of time in our papers and before the court talking about third-party standing. We did not talk about redressability, and the Supreme Court has made clear that Article III jurisdiction is dependent, in significant part, upon whether or not the plaintiffs, if successful, can get the benefit that they want from the Supreme Court. Let me ask you about that, because I'm a little puzzled as to what we're supposed to focus on for that purpose. In Northeastern Florida Chapter of Associated General Contractors, here's what the court says there. When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained, not even have to allege, that he would have obtained the benefit, but for the barrier in order to establish standing. The injury, in fact, in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. Is there any reason for a free exercise claim to be different than that? It's not that a free exercise claim is different, Your Honor. That case, like the Bakke case, like many, many other cases, doesn't put the plaintiff to the nearly impossible burden of showing that but for discriminatory conduct they would receive the benefit. They don't have to allege anything about obtaining it. That's right, but that's not the problem. Because equal treatment is the problem. Why isn't it the same here? There is a benefit. They are being treated, they claim, unequally with respect to that benefit. Then with respect to redress, the redress is to reduce the equal treatment. It's not to get them into the school, because the injury comes from the equal treatment itself, just like in the contractor case. But it's not like the contractor case, because in this case, the regulated entity are the schools, not the parents. And so the ability of the parents to get what they wish... You say that the regulated entity is the school, but the complicating factor here is it is a benefit to the individual, right? But it's no more than... It's the student who gets the money. Actually, no, it's the school that gets the money. Well, but only if the student chooses for the money to go to the school, right? If the school desires and participates in the program, they get the money directly from the local school administrative unit, if that is the choice of the parent. But, Your Honor, this is no different than the Eastern Kentucky Rights case cited in our brief. The issue was the regulation of the hospitals, yet it was indigent individuals who were claiming they were entitled to care. And the court said very clearly that plaintiff's burden... The question is whether that is the right analogy as to case, or whether because this is a benefit case, it should be seen differently. In other words, if what is being made available is money to students, and they are being denied equal treatment in their ability to utilize that money, then it seems much more like the contractor case than the indigent's rights case that you're identifying. But it's not because there's no Supreme Court case that says, if it's an individual benefit case, we can... That's where it is in contract. You don't have to allege whether you get it, because the equal treatment restricting your use of the benefit is the constitutional problem that gives you injury in fact. But it doesn't give you redressability. But the redressability is to remove the equal treatment. That's all you need. Once you remove the equal treatment, then the injury in fact is redressed. And that could be done here by simply invalidating the sectarian requirement. But it can't, because invalidating the sectarian requirement in no way determines whether or not the student will get the benefit. In order for the student to get the benefit, a regulated entity, a school...